## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **IGNACIO RIOS III,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 14 C 2433** |
| **v.** | ) | |
| | ) | **Magistrate Judge** |
| **CAROLYN W. COLVIN, Acting** | ) | **Maria Valdez** |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant Ignacio Rios III ("Claimant") seeks review of the final decision of Respondent Carolyn W. Colvin, Acting Commissioner of Social Security ("the Commissioner"), denying Claimant's application for Supplemental Security Income Benefits ("SSI") under Title XVI of the Social Security Act ("the Act"). Pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, the parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings, including entry of final judgment. [Doc. No. 8.] Claimant submitted a memorandum, which this Court will construe as a motion for summary judgment. [Doc. No. 15.] Defendant has submitted a cross-motion for summary judgment. [Doc. No. 19.] For the reasons stated below, Defendant's motion for summary judgment is denied and Claimant's motion for summary judgement is granted.

---

[1] Carolyn W. Colvin is substituted for her predecessor, Michael J. Astrue, pursuant to Federal Rule of Civil Procedure 25(d).

# I. PROCEDURAL HISTORY

On February 14, 2011, Claimant filed an application for SSI, alleging a disability onset date of January 24, 2011. (R. 140-49.) The claim was denied initially on June 30, 2011 (R. 90.), and upon reconsideration on October 5, 2011. (R. 71.) On November 17, 2011, Claimant requested a hearing before an Administrative Law Judge ("ALJ"), which was held on September 14, 2012. (R. 27-87.) At that hearing, Claimant, who was represented by counsel, appeared and testified. *Id.* A vocational expert ("the VE") appeared by telephone and testified. *Id.*

On November 30, 2012, the ALJ issued a written decision. (R. 9-22.) In the decision, the ALJ went through the five-step sequential evaluation process applicable to Claimant's application, 20 C.F.R. § 416.920(a)(4), and found Claimant not disabled under the Act. (R. 22.) At step one, the ALJ found that Claimant had not engaged in substantial gainful activity ("SGA") since December 28, 2010, the protective application date. (R. 14.) At step two, the ALJ found that Claimant had the severe impairments of lumbar degenerative disease, multiple sclerosis[2] with

---

[2] Multiple sclerosis is:

> a disease in which there are foci of demyelination throughout the white matter of the central nervous system, sometimes extending into the gray matter; symptoms usually include weakness, incoordination, paresthesia, speech disturbances, and visual complaints. The course of the disease is usually prolonged, so that the term multiple also refers to remissions and relapses that occur over a period of many years.

DORLAND'S MEDICAL DICTIONARY (32nd ed. 2012) [hereinafter DORLAND'S], *available at* dorlands.com.

myelopathy[3] and obesity. *Id.* At step three, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in Appendix 1 to 20 C.F.R. Part 404, Subpart P. *See* 20 C.F.R. § 416.920(a)(4)(iii). (R. 16.)

The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform sedentary work. (R. 16.) The ALJ also found that Claimant's RFC was further limited to no more than frequent fingering bilaterally, engaging in only occasional balancing, and that Claimant should avoid ladders, ropes, and scaffolds. (R. 16-17.) At step four, the ALJ found that Claimant was unable to perform any of his past relevant work. (R. 20.) At step five, however, the ALJ found that there were jobs that existed in significant numbers in the national economy that Claimant could perform. (R. 21.) Specifically, the ALJ found that Claimant could work as a production clerk, call out operator, charge account clerk, or telephone quotation clerk. *Id.* Because of this determination, the ALJ found that Claimant was not disabled under the Act. (R. 22.)

## II. FACTUAL BACKGROUND

### A. Medical Evidence

Claimant had been seeing neurologist Dr. Bruce A. Cohen, M.D. since February of 2011, for his acute myelitis and paresthesia in his right upper extremity. (R. 272-76.) Claimant reported that, about six weeks prior, he had

---

[3] Myelopathy is "any of various functional disturbances or pathological changes in the spinal cord, often referring to nonspecific lesions in contrast to the inflammatory lesions of myelitis." DORLAND'S.

"developed parasthesias[4] in his right upper extremity, initially in the hand, followed by symptoms ascending up the arm." (R. 274.) A few weeks later he had been bowling and "found that he could not lift the ball or feel it. The next morning, he noticed sharp, painful paresthesias extending to his right leg." *Id.* Claimant reported to the emergency room and was admitted, where a lesion on his spinal cord was revealed. *Id.* He was given a course of steroid therapy for five days and then discharged. *Id.*

In his initial assessment, Dr. Cohen indicated that a review of Claimant's January 24th and 25th brain MRI revealed minimal abnormalities with a punctate focus in the right juxtacortical posterior frontal parietal region and a questionable focus adjacent to the right trigone. (R. 276.) The images of the cord revealed three lesions in the cervical cord located at C2-C3 anteriorly, C3-C4 posteriorly, and C5 posteriorly. *Id.* The images of the thoracic spinal cord revealed four additional legions involving the dorsal aspect of the cord on the left and the right, the central aspect of the cord and a right lateral column lesion. *Id.* Dr. Cohen's impression was that Claimant had a history of neurologic events which were suggestive of multiple sclerosis relapses, and that his spinal fluid revealed evidence of inflammatory changes consistent with his acute myelitis. (R. 276.) He noted that claimant was walking with crutches, although he was able to walk without them. (R. 275-76.) Dr. Cohen also noted deficits in sensation and that Claimant's in motor power in his right hand and right lower extremity. (R. 275.) Dr. Cohen prescribed carbamazepine

---

[4] Paresthesia is "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus." DORLAND'S.

for neurologic pain, but asked Claimant to follow up with a nurse practitioner in a month to consider a course of therapy. (R. 276.)

On March 9, 2011, Claimant had a follow-up appointment with nurse practitioner Melanie Dumlao. (R. 281.) Dumlao reported that Claimant had returned early due to worsening symptoms. (R. 285.) He reported worsening of burning pain in his right side, particularly his hand, as well as weakness in his hand, and that he was dropping objects frequently. *Id.* The carbamazepine[5] prescribed earlier was not helping. *Id.* Dumlao noted decreased coordination in Claimant's right upper and lower extremity. (R. 287.) Plaintiff's carbamazepine was discontinued, and pregabelin[6] was added instead for neuralgia. (R. 288.) On March 16, Claimant returned to see Dr. Cohen, who recorded decreased sensation in Claimant's right upper and lower extremities, as well as weakness in his right hand. (R. 291.) Dr. Cohen noted that Claimant's pregabelin also had not been effective, and the dosage was increased. *Id.* Claimant returned on April 19 to discuss further treatment options with nurse practitioner Dumlao. (R. 334.) Although he had noticed some improvement since his prior visit, he continued to have burning in his right upper extremity and hand, with right knee and foot weakness and sensory problems in his right foot. *Id.* Dumlao again recorded decreased sensation in Claimant's right upper extremity. (R.335.) Dumlao prescribed Copaxone[7] and increased claimant's pregabelin prescription. (R. 335.)

---

[5] Dumlao referred to this medication by a brand name, Tegretol. (R. 285, 290.)

[6] Dumlao referred to this medication by a brand name, Lyrica. (R. 288, 290.)

[7] Copaxone is a "trademark for a preparation of glatiramer acetate," which is "used to reduce relapses in multiple sclerosis." DORLAND'S.

Dumlao emphasized to Claimant that "the goal of therapy is not to improve current deficits but to prevent/decrease [the] frequency of future relapses and slow progression of the disease." (R. 334.)

On May 3, 2011, Claimant was examined by state agency consultant physician, Dr. Anand Lal, M.D. (R. 294-301.) Claimant complained of pain and burning sensation in his right hand, right chest, and lower extremities – the right side more than the left, and also reported issues with his vision. (R. 294.) Dr. Lal indicated that, at the time, Claimant had no neurological deficits and was alert and oriented, but had an antalgic gate that required the use of a cane to help ambulate. (R. 297, 299.) Dr. Lal's impression was that Claimant suffered from demyelinating disease affecting the cervical and thoracic spine as evidenced by the MRI performed in January of 2011, generalized weakness on his right side, and pins, needles, paresthesia,[8] and tingling feeling in both lower extremities, right chest, abdominal wall and right arm probably secondary to demyelinating disease. *Id.* On May 13, 2011, an Illinois Request for Medical Advice ("IRMA") was completed by state agency consultant physician, Dr. Lenore Gonzalez, M.D. (R. 302-04.) Dr. Gonzalez indicated that as of February 24, 2011, Claimant met Listing 11.09A, *see* 20 C.F.R. Part 404, Subpart P, Appendix 1 § 11.09, for multiple sclerosis. (R. 302.)

On June 10, 2011, however, non-examining state agency consultant physician, Dr. Linda B. Caldwell, M.D., completed a Physical Residual Functional Capacity Assessment. (R. 309-17.) Dr. Caldwell reviewed the medical evidence from

---

[8] Paresthesia is "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus." DORLAND'S.

January 24, 2011 through May 3, 2011 and found that it of record failed to support that Claimant met Listing 11.09A because there was no convincing evidence that the intensity, persistence, and limiting effects of Claimant's symptoms affected his ability to do basic work activities as severely as reported. (R. 317.) Specifically, Dr. Caldwell mentioned that there was no documented evidence for the limitations Claimant alleged with regard to using his hands. *Id.* Nor did she find documented evidence that Claimant was limited in sitting, talking, or that he was only able to walk twenty to thirty feet before needing rest. *Id.* Instead, Dr. Caldwell indicated that Claimant could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk at least two hours in an eight hour workday, sit for a total of six hours in an eight hour workday, and had an unlimited ability to push or pull. (R. 310.) Dr. Caldwell also indicated that Claimant was limited to occasional balancing, frequently stooping, kneeling, crouching, crawling, climbing ramps and stairs, could never climb ladders, ropes, or scaffolds, and was limited to only frequent fine manipulation with his right hand. (R. 311-12.) Subsequently, on June 23, 2011, Dr. Gonzalez completed another RFC assessment and adopted the findings of Dr. Caldwell. (R. 319-26.) An additional review of the medical evidence was completed by Dr. Charles Wabner, M.D. on September 30, 2011. (R. 344-46.) Based on the June 23, 2011 RFC Assessment, Dr. Wabner revised Dr. Gonzalez's prior decision and found that Claimant failed to meet listing 11.09A. (R. 346.)

On July 6, 2011, Claimant was examined at a follow-up visit with Dr. Cohen. (R. 339-42.) The assessment revealed multiple sclerosis, right hemisensory loss,

right hand weakness, neuralgia, and cervical myelopathy. (R. 342.) From May 2011 through May 2012, Claimant was examined at Advocate Illinois Masonic Family Practice. (R. 366-72.) Claimant continued to complain of knee pain, body aches, and multiple sclerosis pain. *Id.* On January 24, 2012, he also had decreased flexion in his spine. (R. 371.) In May of 2012, Claimant also had a herniated disk at the L4-L5 level and depression. (R. 366.) In June of 2012, Claimant was examined at Advocate Medical Group ("AMG"). He continued to experience back pain, multiple sclerosis symptoms, and depression. (R. 364.)

On July 19, 2012, Claimant was examined by Dr. Caroline Leof, D.O. at AMG. (R. 355-58.) Claimant reported that a burning sensation in his right arm and leg persisted. (R. 355.) On September 4, 2012, Claimant was examined by Dr. Jonathan Cone, M.D., who recorded that that Claimant had persistent back pain and that his mood was poor. (R. 352.) Dr. Cone indicated that Claimant suffered from multiple sclerosis, back pain, and depression. (R. 354.) Dr. Cone ordered Claimant to continue his Copaxone injections, fluoxetine, cyclobenzaprine, and hydrocodone-acetaminophen. (R. 353.) Claimant continued following up with Dr. Cohen on June 4, 2012. (R. 391.) Subsequently, Dr. Cohen indicated that a September 2012 brain MRI revealed several areas of increased T2/Flair signal in the periventricular region, 1 juxtacortical, and that the thoracic spine MRI demonstrated several discrete lesions throughout the cord. *Id.* The small foci were of abnormal T2 location scattered throughout the brain, some of which were new, while others were stable, compatible with multiple sclerosis. (R. 397.)

### B.    Claimant's Testimony

Claimant testified that, on an average day, he would wake up at around 9:00 or 9:30 am, if he was able. (R. 43.) His wife would prepare his older daughter for school and would feed the baby. *Id.* Plaintiff would take his Fluoxetine immediately, "[w]ait until that starts kicking in a little bit," and then "[t]ry to clean up a little bit, the house, as much as I can." *Id.* The babysitter would arrive at 11:00 am to "take care of my kid and take her to school." *Id.* Claimant stated that he stayed home with his two-year-old daughter child when she got out of school, "either resting or just doing whatever in the house," but that he "really [doesn't] do anything." *Id.*

Around 1:00 pm, he would take his Copaxone shot, which "puts me out of commission for a couple hours. I can't really move. I can't do anything. I'm in such pain that it doesn't allow me to really function much." (R. 44.) He stated that he had to schedule his activities around the shot because it would "put[ him] out of commission  for a while." (R. 45.) He had begun taking the medication in June or July of 2011. (R. 46-47.) He stated that he was able to drive once or twice a week. (R. 48.) He was able to shop at the grocery store with his wife once a week. (R. 48.)

Claimant stated that he was able to carry 10 pounds—and "[s]ometimes . . . a little more"—but that his right (and dominant) hand was weaker, and he only had "about 80 percent feeling" in the right hand. (R. 49.) Because of this deficit, he had "a tendency of dropping things, breaking the dishes, stuff like that just slips out of my hands." (R. 49.) Claimant also stated that he had "a burning, numbing, tingling sensation that's nonstop. I feel it all day, every day. Sometimes, as I get tired, or

hot, or frustrated, or stressed out, it gets worse. It's harder to focus. It's harder to concentrate on anything I really do. I can barely sit still at times." (R. 49.) The ALJ confronted Claimant about a doctor's report from May 2011, in which Plaintiff stated that he "has a good grasp" and "doesn't drop anything." (R. 52.) Claimant replied that, when he had made that report, he "felt at the time that I was improving, so that might have been the feel of the conversation. But I don't recall ever saying that I don't drop anything, because that's been one of my main issues." (R. 52.) Claimant stated that, "maybe I told him on a less basis I was dropping—at the time, because, like I said, I feel better on certain days. I was trying to be optimistic about my condition improving. But I was wrong at that time. (R. 52-53.) The ALJ also asked Claimant if there had been "updated testing to evaluate whether the lesions in your back have stayed the same, gotten worse? Anything like that," to which Claimant responded that he had an MRI scheduled for September 16th, a few days after the hearing. (R. 59.)

### C.    The ALJ's Decision

The ALJ evaluated Claimant's case according to the Administration's five-step evaluation process. *See* 20 C.F.R. § 416.920(a)(4). At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since his application date of December 28, 2010. (R. 14.) At step two, the ALJ determined that Claimant suffered from the severe impairments of lumbar degenerative disk disease, multiple sclerosis with myelopathy, and obesity. (R. 14.) At step three, the ALJ concluded

that Claimant's impairments, alone or in combination, did not meet or equal a Listed Impairment, specifically noting Listing 11.09.

The ALJ then determined Claimant's residual functional capacity (RFC), and determined that he had the capacity to perform sedentary work, limited to "no more than frequent fingering bilaterally." (R. 16-17.) The ALJ noted that, in past medical examinations, Claimant had indicated that he experienced numbness and pain on his right side which affected his ability to lift and use his hands. (R. 18.) The ALJ also noted that he had reported using a cane in the past. *Id.* However, the ALJ found significant that, at a later examination in September 2011, Claimant "admitted then that he only uses a cane intermittently, as necessary, and that he can sit for at least two hours at one time, and pay attention for two hours without difficulty." The ALJ gave "great weight" to the June 2011 opinion Dr. Lina Caldwell, who had found claimant capable of lifting or carrying 20 pounds occasionally and 10 pounds frequently, standing for two to three hours and sitting for six hours, and occasionally "fingering with the right upper extremity." (R. 20.) The ALJ found this opinion "consistent with the evidence submitted at the hearing level showing improvement," as well as "with the claimant's own admission and testimony that he is able to care for his young children, drive and do light housework with breaks." *Id.*

With respect to the evidence submitted after Dr. Caldwell rendered her opinion, the ALJ found it consistent with that opinion because, at a June 2011 examination, Dr. Cohen had recorded "5/5 strength bilaterally, and Claimant's gait and station were normal despite somewhat decreased sensation in his lower

extremities and right upper extremity." (R. 20, 391.) The ALJ found that "[t]he record would tend to correlate to a gradual, if progressive, process that remits in response to therapy." (R. 19.) He noted that Claimant's 2011 MRI "documented multiple lesions and hyperintense foci consistent with demyelinating disease," but concluded that "there were no new MRIs showing disease advance, although the most recent September 2012 MRIs showed several areas of increased T2/Flair signal in the periventricular region and one juxtacortical with several discrete lesions throughout the thoracic spine." (R. 19.)

### III. STANDARD OF REVIEW

A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel,* 530 U.S. 103, 106–07 (2000). In this circumstance, the district court reviews the decision of the ALJ. *Id.* The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Thus, judicial review is limited to determining whether the ALJ's decision is supported by substantial evidence in the record and whether the ALJ applied the correct legal standards in reaching that decision. *Nelms v. Astrue,* 553 F.3d 1093, 1097 (7th Cir. 2009). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Richardson v. Perales,* 402 U.S. 389, 401 (1971), but a "mere scintilla" of evidence is not enough. *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue,* 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion." *Berger v. Astrue,* 516 F.3d 539, 544 (7th Cir. 2008).

## IV. ANALYSIS

Claimant asserts that the ALJ made two errors, first with respect to his evaluation of the medical evidence and second with respect to his credibility finding. The Court finds that the ALJ erred with respect to his evaluation of the medical evidence in this case, and accordingly his decision was not supported by substantial evidence. Because this conclusion requires remand for additional proceedings, the Court need not address the ALJ's alleged errors with respect to evaluating Claimant's credibility at this time.

### A.     The ALJ's Assessment of the Medical Evidence

Claimant asserts that the ALJ in assessing the medical evidence of record in this case.  Claimant contends that, in relying on the opinion of Dr. Lina Caldwell— rendered prior to significant medical treatment Claimant received—to find that his

multiple sclerosis did not meet or equal Listing 11.09[9] and in calculating his RFC, the ALJ erred. Because Dr. Caldwell's opinion was rendered without the benefit of this evidence, but because the ALJ nonetheless found the evidence consistent with Dr. Caldwell's conclusion without having it reviewed by a physician, Plaintiff contends the ALJ overstepped his authority. (Pl.'s Mem. at 10.) The Commissioner responds that substantial evidence supported the ALJ's decision to give great weight to Dr. Caldwell's opinion because it was consistent with the evidence submitted at the hearing level showing improvement in Claimant's condition and consistent with Claimant's testimony of his own reported daily activities.

Dr. Caldwell's assessment formed the basis of the Commissioner's decision to find that Listing 11.09 was not met and that Plaintiff was capable of lifting and carrying 20 pounds occasionally and 10 pounds frequently, standing and walking for two to three hours and sitting for six hours, and could perform "no more than frequent fingering with the upper right extremity." (R. 20.) Dr. Caldwell rendered her opinion in June 2011. (R. 309-18.) In her narrative explanation for her conclusion, Dr. Caldwell noted that one consulting examiner had noted that, "at this

---

[9] According to Listing 11.09, a claimant must show multiple sclerosis with either "[d]isorganization of motor function as described in 11.04B,"[v]isual or mental impairment as described under the criteria in 2.02, 2.03, 2.04, or 12.02," or "[s]ignificant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process." 20 C.F.R. Part 404, Subpart P, Appendix 1 § 11.09. Although the ALJ's only explicit acknowledgement of Listing 11.09 was to say that "[t]he evidence also does not establish the requisite severity of disorganization of motor function, visual or mental impairment or fatigue required under Listing 11.09," (R.16), he addressed the substance of the listing in detail in the RFC section of the opinion. *See Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010).

time, [Plaintiff] has no neurological deficits," and that the CE had recorded "no sensory deficits." (R. 317.) Furthermore, Dr. Caldwell noted that—aside from one CE examination—at "[n]o place other than this one time CE is there mention of a cane use," and that—while a physical therapy report had recommended crutches in January 2011, there was no "mention of need for or use of crutches and/or cane at the longitudinal Neuro clinic visits." *Id.*

However, after Dr. Caldwell had rendered her opinion, Plaintiff received treatment from a number of different providers, and medical evidence from these encounters was submitted as part of the record. On June 4, 2012 Plaintiff was again seen by Dr. Cohen,[10] who noted that Plaintiff complained of numbness and tingling in his right leg which "feels like fire." (R. 388.) With regard to changes since his last visit, Dr. Cohen noted Plaintiff was "continuing to improve, strength better," and that he experienced "weakness only when tired," but that "paresthesias in the right U[pper ]E[xtremity] persist." (R. 389.) Although recording normal strength in the upper extremities, Dr. Cohen noted decreased sensation in both Plaintiff's upper and lower right extremities. (R. 391.) As part of his plan, Dr. Cohen noted that a brain MRI was planned for September, and that he would follow up afterward. (R. 392.) At a subsequent appointment on June 6, 2012, Dr. Cone noted that Plaintiff was using a cane for walking. (R. 363.) Dr. Cone also ordered a pain management referral and a follow-up a month later. *Id.*

---

[10] Although this treatment was obtained just prior to when Dr. Caldwell rendered her opinion as to Plaintiff's RFC, it does not appear from the record that Caldwell had access to this record when reaching her opinion.

In July, Dr. Caroline Leof of the same practice group treated Plaintiff. At this appointment, Plaintiff reported experiencing a burning sensation in his right shoulder to his fingertips, as well as his right leg to the toes. (R. 355.) He also stated that the pain impaired his walking. *Id.* Dr. Leof also noted added weakness in Plaintiff's arm and leg, which "[o]ccasionally impairs walking." *Id.* And in a September 2012 follow-up, Plaintiff reported the addition of a tingling sensation in his legs to Dr. Cone. (R. 359.) In his physical examination, Dr. Cone noted that Plaintiff "[u]ses a cane to ambulate, somewhat hunched," although he had normal muscle tone and a normal handshake. (R.353.) Dr. Cone noted that the plan was to obtain the MRI of the brain. (R. 354.) Finally, on September 19, 2012 Plaintiff underwent the MRI, which revealed "several small foci of abnormal T2 location scattered throughout the brain, some of which are new while others are stable." (R. 397.) The report went on to detail the location and sizes of the lesions. *Id.*

While the ALJ "has the authority to assess the medical evidence and give more weight to evidence he finds more credible," *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989), the Seventh Circuit has "recognized that an ALJ cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so." *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007). When the ALJ "rel[ies] on conjecture and [his] own assessment of the medical evidence to reach conclusions unsupported by the record," the decision is not supported by substantial evidence. *See Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003). Furthermore, an ALJ "must obtain an updated medical opinion from a medical

expert . . . [w]hen additional medical evidence is received that in the opinion of the administrative law judge . . . may change the State agency medical or psychological consultant's finding" regarding the Listings. SSR 96-6p, 1996 WL 374180, at \*4.

In this case, when the ALJ concluded that the medical evidence submitted after Dr. Caldwell's opinion was rendered was consistent with her opinion, he inappropriately "played doctor" and ascribed medical significance to those records which he was not required to do. Although the ALJ's determination as to Listing 11.09 and claimant's RFC rested his conclusion that the evidence submitted after Dr. Caldwell's assessment was consistent with that assessment, the evidence in fact contradicted that assessment in significant ways. First, with respect to the 2012 MRI, the ALJ found that MRI did not indicate advance of Claimant's MS; however, the MRI in fact revealed the presence of new lesions that were not present in the earlier MRI (on which Dr. Caldwell's opinion relied). But whether or not these results were consistent with advance of the disease and Claimant's alleged symptoms was a medical decision that the ALJ was not qualified to make. *See Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (holding ALJ's interpretation of MRI evidence error); *see also Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014) ("ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves.").

Furthermore, the ALJ's conclusion as to the new medical evidence relied heavily on individual treatment notes indicating that, at certain times, Claimant showed the ability to walk without limping and demonstrated full strength in his

upper extremities. (R. 19-20.) Dr. Caldwell's opinion itself also relied on the lack of noted "sensory deficits, as well as the absence of cane use in the medical records she reviewed. (R. 317.) But Claimant's treatment records from after Dr. Caldwell rendered that opinion show evidence of both. (R. 342, 353, 355, 359, 363.) *See Czarnecki v. Colvin*, 595 F. App'x 635, 644-45 (7th Cir. 2015) (holding that ALJ erred in finding " 'examinations and test results' showed that [claimant] did not need to use a cane, which she used at the hearing. But one of Czarnecki's physicians, after more than a year of treating her, had prescribed a cane, and the ALJ impermissibly 'played doctor' by substituting her own opinion that a cane really wasn't necessary.").

Additionally, as other courts have recognized, multiple sclerosis is "[a] slowly progressive . . . disease characterized by disseminated patches of demyelination in the brain and spinal cord, resulting in multiple and varied neurological symptoms and signs, usually with remissions and exacerbations." *Mcalister v. Heckler*, No. 84 C 7183, 1986 WL 5223, at *4-5 (N.D. Ill. May 1, 1986) (quoting 5 MERCK MANUAL OF DIAGNOSIS AND THERAPY 1442 (13th ed.)); *see also Wilcox v. Sullivan*, 917 F.2d 272, 277 (6th Cir. 1990) ("Multiple sclerosis is an incurable, progressive disease subject to periods of remission and exacerbation."); *Rudder v. Colvin*, No. 11 CV 50286, 2014 WL 3773565, at *2 (N.D. Ill. July 30, 2014). Although some of the after-acquired records show that Plaintiff was able to walk and had good strength at those specific appointments, these are simply snapshots at a given period, and not necessarily inconsistent with Plaintiff's claims of fluctuating symptoms given the

evidence in this case. *See Vincil v. Comm'r of Soc. Sec.*, No. 12-12728, 2013 WL 2250580, at *13 (E.D. Mich. May 22, 2013) ("If Plaintiff's impairment were one subject to linear decline or improvement, such as a broken bone, evidence of improvement might be considered 'inconsistent' with a physician's opinion that a patient is disabled; however, multiple sclerosis is, by its very nature, a disease that waxes and wanes.") (citing *Wilcox v. Sullivan*, 917 F.2d 272, 277 (6th Cir.1990)); *cf. Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) ("Even if we accept the March 2007 treatment note as evidence that Punzio enjoys a few 'good days,' that evidence still offers no support for the ALJ's finding that her mental illness does not prevent her from holding a job. After all, the vocational expert testified that no employer would hire Punzio to perform unskilled work if her mental illness limits her abilities even just 20 percent of the time—or if she experiences as few as three 'bad days' a month that cause her to miss work.").

While it was Claimant's responsibility to produce evidence in this case, and although the "duty to make a complete record . . . can reasonably require only so much," *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004), the ALJ also has a "responsibility to recognize the need for additional medical evaluations." *See Scott v. Astrue*, 647 F.3d 734, 741 (7th Cir. 2011). In this case, the ALJ should have submitted the additional medical evidence to a medical expert before concluding that Plaintiff's condition had improved and that the medical evidence submitted after Dr. Caldwell's evaluation was consistent with that evaluation. In failing to do so and instead concluding that the evidence did not contradict Dr. Caldwell's

evaluation, the ALJ inappropriate "played doctor." Accordingly, this case must be remanded to the Administration.

### B. The ALJ's Assessment of Claimant's Credibility

Claimant also makes a number of arguments regarding the ALJ's assessment of his allegations as to the limiting effects of his symptoms. Because the decision will otherwise be remanded as described above, the Court need not address these alleged errors in detail here. *See Scott*, 647 F.3d 734, 741 (7th Cir. 2011). However, the Court does not that, since the ALJ decided Claimant's case, the Social Security Administration has recently updated its guidance about evaluating the effects of a Claimant's symptoms on his RFC, eliminating "credibility" from the analysis to "clarify that subjective symptom evaluation is not an examination of the individual's character." *See* SSR 16-3p, 2016 WL 1119029 (effective March 28, 2016). *Id.* at *1. On remand, the ALJ should re-evaluate the effects of Claimant's symptoms in light of SSR 16-3p.

Additionally, the Court notes that the ALJ did not specifically address one of Plaintiff's main symptoms—that, as a side effect of his prescribed daily shot of Copaxone, he was rendered incapacitated for up to two hours at a time. (R. 44.) Given the testimony of the Vocational Expert that anything more than 12 percent of off-task time would eliminate all employment, (R. 75), this allegation should be specifically consider this allegation explicitly on demand. See 20 C.F.R. 416.929(c)(3)(iv) ("Factors relevant to your symptoms, such as pain, which we will consider include . . . side effects of any medication you take or have taken to alleviate your pain or other symptoms"). Finally, the ALJ should be mindful that

the Seventh Circuit has repeatedly cautioned care in evaluating the significance of a claimant's daily activities when determining the ability to perform full-time work. *See, e.g.*, *Engstrand v. Colvin*, 788 F.3d 655, 661 (7th Cir. 2015); *see also Hill v. Colvin*, 807 F.3d 862, 869 (7th Cir. 2015) (discussing claimant's babysitting). On remand, the ALJ should also closely determine the consistency of the activities Claimant is found able perform with the limitations the ALJ finds to exist, and the compatibility of those limitations with sustaining full-time work, consistent with the Administration's new guidance.

## IV. CONCLUSION

For the foregoing reasons, Claimant Rios' motion for summary judgment is granted and the Commissioner's cross-motion for summary judgment [Doc. No. 19] is denied. The Court finds that this matter should be remanded to the Commissioner for further proceedings consistent with this Order.

**SO ORDERED.**                                        **ENTERED:**


**DATE:      May 24, 2016**                    _____
                                               **HON. MARIA VALDEZ**
                                               **United States Magistrate Judge**